# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER E. ARIAS,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>Defendant. | No. 15 C 1541<br><br>Magistrate Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christopher E. Arias filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq., 1381 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

### I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act.[1] *York v. Massanari*, 155 F.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. Regulations governing Supplemental Security Income (SSI) are

Supp. 2d 973, 978 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, stops the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

set forth at 20 C.F.R. § 416.901 et seq. The standards for determining disability under DIB and SSI are virtually identical. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff protectively applied for DIB on March 1, 2012, alleging that he became disabled on January 13, 2011, because of cervical and shoulder injuries. (R. at 20, 136, 172). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 20, 69, 75). On June 17, 2013, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 20, 32–66). The ALJ also heard testimony from Bernard Stevens, M.D., a medical expert (ME), and GleeAnn L. Kehr, a vocational expert (VE). (*Id.* at 120, 32–66, 129–31).

The ALJ denied Plaintiff's request for benefits on August 9, 2013. (R. at 20–27). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since January 13, 2011, the alleged onset date. (*Id.* at 22). At step two, the ALJ found that Plaintiff's cervical spine disease, spinal stenosis, status post fusion at C4–C7, mild arthritis, and left shoulder tendon tear are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 23).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that he can perform light work, with the following restrictions:

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum

> [Plaintiff] could never climb ladders, ropes, or scaffolds, and could only occasionally climb ramps/stairs, balance, kneel, stoop, crouch, or crawl. [Plaintiff] could only occasionally perform bilateral overhead reaching and frequent reaching below shoulder level. He should not work at unprotected heights or with dangerous machinery, nor should he do any commercial driving. Lastly, given [Plaintiff's] history of ear surgery, he should not work in an environment with loud noise.

(R. at 23). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff could not perform his past relevant work as a courier. (*Id.* at 26). At step five, based on Plaintiff's RFC, his vocational factors, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including work as an office helper, information clerk, or counter clerk. (*Id.* at 26–27). Accordingly, the ALJ concluded that Plaintiff is not under a disability, as defined by the regulations. (*Id.* at 27).

The Appeals Council denied Plaintiff's request for review on December 21, 2014. (R. at 1–5). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh

---

that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks eviden-

tiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff, a high school graduate who was 53 years old at the time of his 2013 hearing, worked as a package delivery courier/driver for approximately 25 years. (R. 40–43, 173). Plaintiff suffered neck and shoulder pain after a motor vehicle collided with his delivery truck on January 13, 2011. A January 25, 2011 right shoulder MRI revealed a partially torn tendon and tendon strain. (*Id.* at 634). An MRI of the cervical spine taken the same day displayed disk protrusion and spinal stenosis. (*Id.* at 229).

Plaintiff's right shoulder pain resolved, but he continued to experience pain in his neck, sharp pain in his right shoulder, numbness in his left hand, and weakness in his left hand and arm. (*Id.* at 274, 616–17, 751). Two injections and several months of physical therapy did not improve his symptoms. (*Id.* at 637–92, 698). Plaintiff also tried muscle relaxants, but quit because they were ineffective and made him sleepy. (*Id.* at 275, 750).

At an independent medical examination on August 26, 2011, John L. Andreshak, M.D., noted some tenderness and muscle tightness in his left shoulder, and some areas of decreased strength on the left, reduced reflexes on the left triceps muscle, and subjective reports of numbness in the ring and small fingers of the left hand. (R. at 230–31). After a physical exam and a review of Plaintiff's medical records and cervical MRI, Dr. Andreshak assessed cervical spondylosis (a degenerative joint dis-

ease) with myelopathy (a disturbance to the spinal cord), and cervical disk herniation. (*Id.* at 232). He opined that the herniation was consistent with Plaintiff's left arm radiculopathy and weakness. (*Id.*). He recommended cervical spine surgery followed by physical therapy, and estimated that Plaintiff would be able to return to work four to five months after the surgery. (*Id.*). However, the doctor noted that he had not seen a shoulder MRI, and "sometimes shoulder issues may be masked by cervical pathology." (*Id.*). He concluded that Plaintiff's shoulder impairments would be determined after his cervical surgery and therapy. (*Id.*).

In November 2011, Plaintiff underwent an anterior cervical discectomy and spinal fusion at C4–C7. (R. 241, 274–79, 600–02). He appeared to heal well from the neck surgery, but continued to suffer symptoms in his left shoulder, including pain on movement and "clicking." (*Id.* at 578, 727–28). As of March 29, 2012, he was still taking Norco (a combination of acetaminophen and hydrocodone), although he took it only rarely because of the side effects. (*Id.* at 727). Though his doctors recommended a left shoulder MRI, it took several months for Plaintiff to receive insurance approval for the scan. (*Id.* at 698, 727, 966).

In May 2012, agency reviewer Francis Vincent, M.D., reviewed and summarized Plaintiff's medical records and determined that he retained the capacity to perform work-related functions up to the date of his surgery, and that he was still improving from the surgery. (R. at 867). He also noted Plaintiff's limited ranges of motion and continuing left shoulder pain. (*Id.* at 861–62). Dr. Vincent determined that Plaintiff was capable of light work, but with only occasional climbing of ladders or scaffolds

and occasional reaching in all directions, with no other limitations. (*Id.* at 861–63.) Another reviewing doctor, Richard Lee Smith, M.D., reviewed and affirmed Dr. Vincent's assessments in July 2012. (*Id.* at 947–49).

Plaintiff continued physical therapy through 2012. (R. at 956–1059). In July 2012, his left shoulder pain was still present with all activities and caused him to wake up three to five times per night. (*Id.* at 881). Progress notes dated October 2012 and January 2013 indicate that the pain increased as his last cortisone injection wore off. (*Id.* at 960, 963). His neck and left shoulder ranges of motion were somewhat limited. (*Id.*).

Scans done by X-ray and MRI in October 2012 showed that Plaintiff had a left rotator cuff tear with superior migration of the humeral head and advanced arthrosis. (R. at 954). His doctor was unsure whether the condition was repairable through surgery. (*Id.*) A repeat MRI on April 16, 2013, revealed that the supraspinatus and infraspinatus tendons of his left shoulder were completely ruptured, with 4.5 centimeters of retraction of the tendon and a superior migration of the humeral head. (*Id.* at 951–53). Plaintiff indicated in May 2013 that he did not wish to proceed with surgery at that time and instead planned to seek a second opinion from another doctor. (*Id.* at 953–4).

At the request of the ALJ, medical expert Bernard Stevens, M.D. reviewed Plaintiff's available medical record and testified at the June 2013 hearing. (R. at 32, 36–41, 62–63). Dr. Stevens opined that, based on his review of the record, Plaintiff appears to have had a successful cervical fusion and decompression, but still has

problems in both shoulders. (*Id.* at 36–38). Dr. Stevens further advised that Plaintiff's shoulder problems do not rise to the level of Listing 1.02(B), but do limit him to light work with no climbing ladders and only occasional overhead reaching bilaterally. He remains capable of frequent but not constant reaching below shoulder level. (*Id.* at 38–39, 62–63). He has no limitations in handling, fingering or feeling. (*Id.*). His post-status cervical fusion, however, limits him to only occasional bending, stooping, crouching, or crawling; and his other impairments preclude working at unprotected heights, commercial driving, and working with dangerous machinery. (*Id.* at 39).

At the hearing, Plaintiff testified that he is right-hand dominant. (R. at 41). After the motor vehicle collision, he had pain across his right shoulder which eventually went away. (Id. at 45). He still has clicking and grinding in his left shoulder, with constant pain at 3/10 which frequently shoots up to 10/10. (R. at 43–45). To prevent this, he is cautious in his movements; for example, he holds his left arm with his right arm to close the car door. (*Id.* at 44, 49). The pain radiates into his left hand, and he has numbness in the fingers. (*Id.* at 51). Reaching overhead increases his pain, which makes it difficult for him to put on a T-shirt. (*Id.* at 45). Plaintiff also has constant neck pain that makes it difficult to look down for long periods of time. (*Id.* at 44). His neck and shoulder pain cause him to wake up two or three times a night. (*Id.* at 44–46, 51). He has lost motion in his neck to the point that he needs to turn his whole body to look to the left, and he feels as if there's a ball at the site of the fused vertebrae. (*Id.* at 45, 52). His neck also bothers him if he

stays in a sitting position or looks down. (*Id.* at 44). It is difficult to concentrate on anything but the pain. (*Id.* at 46). He takes a muscle relaxant, which makes him tired and dizzy. (*Id.* at 45). He also takes pain medication at least once and sometimes twice per day, but when he takes it during the day he gets tired and needs to lie down afterward. (*Id.* at 48). He was told that repairing the shoulder would take extensive surgery, and he "didn't want to have any part of it." (*Id.* at 51–52).

Plaintiff estimated he can lift up to twenty pounds, but only for a short period of time, and not for two or three hours in a workday. (R. at 46–47). His daily activities include attending physical therapy twice a week and light housework such as putting laundry in the machine, walking the dog a short distance, and helping his wife with preparing and cleaning up after dinner. (*Id.* at 47–48, 52). He occasionally drives to a shopping area across the street to do errands, but relies on his wife and son to take him longer distances because he does not feel like he is in full control under the influence of his medications. (*Id.* at 49). He also testified to having problems with his left ear, which makes it difficult to hear well in a noisy room. (R. at 50).

The VE testified that Plaintiff's prior work as a courier was heavy work as performed by Plaintiff. (R. at 54, 131). The ALJ then asked the VE to consider an individual of Plaintiff's age, education, and work experience who could perform light work, except that such person could not climb ladders, ropes, or scaffolds; could only occasional bend, stoop, crouch, or crawl; could only occasionally reach overhead with either arm; could frequently but not constantly reach below shoulder level; could not

do commercial driving; and could not work at unprotected heights, with dangerous machinery, or in a loud noise environment. (*Id.* at 54–55). The VE testified that, due to the restriction on driving, Plaintiff would not be able to do his past work as a courier, but he could perform other jobs including office helper, information clerk, and housekeeper. (*Id.* at 55). When further questioned about the amount of neck rotation, extension, and flexion required for these jobs, the VE noted that the housekeeper job would require a worker to look up and down. She testified, however, that the office helper and information clerk jobs, and the additional position of counter clerk, would be available even to someone with the hypothetical restrictions and limited neck movement. (*Id.* at 55–56). Those three jobs would be possible even if the person could use the non-dominant hand only occasionally, but not if there were no use at all of the non-dominant hand. (*Id.* at 60–62). If the same individual were limited to sedentary instead of light work, there would be no jobs available, and the person would be classified as disabled. (*Id.* at 56–57). The VE further testified that employers typically tolerate no more than one day per month of absences, and no more than 15% of a workday spent off task in addition to regularly scheduled breaks. (*Id.* at 57).

Following the hearing, Plaintiff, with leave from the ALJ, submitted additional medical evidence for her to consider, consisting of physical therapy records, a report from nonexamining medical consultant Dr. Julian Freeman, and Dr. Freeman's resume. (R. 63–65, 956–1068). In his June 25, 2013 report, Dr. Freeman summarized Plaintiff's medical conditions and treatment to date. (*Id.* at 1060–63). Based on

those findings, Dr. Freeman opined that Plaintiff's impairments did not meet the criteria for Listing 1.02, Major Dysfunction of a joint. However, he opined that Plaintiff's arthritis meets the criteria for Listing 14.09, inflammatory arthritis, specifically Listing 14.09(A)(2). (*Id*. at 1062–63). He also opined that, functionally, Plaintiff is capable of walking and standing about six hours a day and sitting about eight hours a day, but he cannot perform even occasional lifting, carrying, pushing or pulling. (*Id*. at 1064). He can lift five pounds only rarely, and ten pounds with one hand or twenty pounds bimanually only "very rarely," which he defined as one percent of the time. Dr. Freeman also specified that Plaintiff cannot reach overhead with either arm, can only occasionally use either arm above waist level, and cannot use hand controls above chest level; he can only rarely use his hands from the waist to very low chest level. (*Id*.). He cannot use ladders, ropes, or scaffolds; he has limitations in his neck ranges of motion; and he cannot be exposed to more than low levels of vibration. Finally, he is subject to "frequent interruption of mental and physical activities by pain." *(Id.)*.

## V. ANALYSIS

Plaintiff raises four arguments in support of his request for reversal: (1) the ALJ erred in omitting Listing 14.09, Inflammatory Arthritis, from her step-three analysis; (2) the ALJ improperly evaluated the medical opinion evidence; (3) the ALJ's analysis of his credibility was flawed; and (4) the ALJ's assessment of Plaintiff's RFC failed to account for all of his impairments.

## A. The ALJ's Listings Analysis is Supported by Substantial Evidence.

Plaintiff argues that, in light of Dr. Freeman's opinion that Plaintiff's arthritis meets the criteria for Listing 14.09(A)(2), it was error for the ALJ to omit consideration of that Listing from her step three analysis. In order to prove disability at step three, a claimant "first has the burden to present medical findings that match or equal in severity all of the criteria specified by a listing." *Knox v. Astrue*, 327 F. Appx 652, 655 (7th Cir. 2009) (unpublished opinion). As a general rule, an ALJ analyzing disability at this step "must discuss the listing by name and offer more than perfunctory analysis" of its criteria. *Minnick v. Colvin,* 775 F.3d 929, 935 (7th Cir. 2015) (quoting *Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir.2004)). However, even where an ALJ has failed to address a specific listing by name, a thorough analysis of the elements of the listing may suffice. *See Jolievette v. Astrue,* 332 F. Appx. 326, 327 (7th Cir. 2009) ("It is not necessary to cite a regulation by number; the agency's obligation is to apply the law to the facts, and this ALJ did so by covering each ingredient of [the Listing.]")

Here, the ALJ provided an analysis of Listing 1.02(B), Major Dysfunction of a Joint, ultimately concluding that Plaintiff does not demonstrate one criterion, the "inability to perform fine and gross movements effectively," which is defined in the regulations as "an extreme loss of function of *both* upper extremities." *See* Listings, § 1.00(B)(2)(c) (emphasis added). The ALJ cited substantial evidence to show that Plaintiff's impairments do not meet this criteria. According to Plaintiff's own testimony and to medical records, his severe upper extremity impairments are limited to

just the left side, leaving him the functional ability to do many tasks with his dominant right arm, which is inconsistent with an "extreme loss of function in both upper extremities."

Plaintiff now asserts that he meets the criteria for Listing 14.09(A)(2), which is "[p]ersistent inflammation or persistent deformity of . . . [o]ne or more major peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements effectively." The relevant functional limitation, the "inability to perform fine and gross movements effectively," is defined the same way for both Listings. Because the ALJ considered the relevant evidence for that criterion in her analysis of Listing 1.02(B) and Plaintiff has provided no additional evidence that his arthritis has caused him an "extreme limitation" in use of both of his upper extremities, the ALJ did not err in omitting a separate discussion of Listing 14.09(B).

## B. The ALJ Failed To Properly Assess Dr. Freeman's Opinion.

Plaintiff argues that the ALJ erred in giving the opinion of consultant Dr. Freeman less weight than the opinion of consultant Dr. Stevens. The two opinions differ in several material respects. In particular, while both doctors opined that Plaintiff is capable of standing or walking for up to six hours in an eight-hour workday, they disagreed as to Plaintiff's ability to use his arms. Dr. Stevens stated that Plaintiff can do light work, which requires the ability to lift 10 pounds occasionally, meaning up to one-third of a work day, and to sometimes lift up to 20 pounds. (R. at 38–39); *see* 20 C.F.R. § 404.1567. In contrast, Dr. Freeman opined that Plaintiff can lift five pounds only "rarely" and can lift ten pounds with either hand or twenty pounds

with both hands only very rarely, defined as "not over 1% of the time." (R. at 1064). Those restrictions, if accepted by the ALJ, would preclude even sedentary work, which requires the ability to lift small articles like docket files up to one-third of the time. See 20 C.F.R. § 404.1567(a); Social Security Ruling (SSR)[3] 83-10. (*Id.* at 38–39, 1064). Dr. Freeman further opined that Plaintiff can never reach overhead with either arm or use any hand controls above chest level, and can only rarely use either arm above waist level. (*Id.* at 1064). The ALJ, however, adopted Dr. Stevens's assessment that Plaintiff is capable of reaching overhead bilaterally up to one-third of the time and capable of reaching below shoulder level "frequently," up to two-thirds of the time. (*Id.* at 23, 38–39). Finally, Dr. Freeman opined that Plaintiff would experience a frequent interruption of his mental and physical activities due to pain, a limitation that appeared neither in Dr. Stevens's opinion nor in the ALJ's RFC assessment. (*Id.* at 1064).

Where, as here, neither medical source has treated or examined the claimant, an ALJ must weigh all medical opinions considering such factors as "the length, nature, extent of the treatment relationship; frequency of examination; [each] physician's specialty, the type of tests performed, and the consistency and supportability of [each] opinion." *Scott v. Astrue,* 647 F.3d at 740; *Books v. Chater,* 91 F.3d 972, 979

---

[3] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably bound by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

(1996). Other factors may include each doctor's familiarity with the claimant's case record and with the rules of the Social Security disability programs. 20 C.F.R. § 404.1527(c)(3)–(6). *See* 20 C.F.R. § 404.1527(c)(3)–(6). The ALJ must provide a "sound explanation" for the weight given each opinion. *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir. 2011).

The ALJ stated that she accepted that portion of Dr. Freeman's opinion about Plaintiff's abilities to walk, stand and sit, and that she "generally agree[d]" with the shoulder and postural limits he assessed. But her RFC does not reflect even general agreement with Dr. Freeman's shoulder limits: he opined that Plaintiff could do no overhead reaching whatsoever and could only rarely use his arms at the waist-to-chest level, restrictions that are not reflected in the ALJ's RFC assessment. (*Id.* at 1064).

The ALJ then gave two reasons for discounting the remaining opinions of Dr. Freeman. First, she found his statement regarding interruptions in mental activities to be outside the scope of his expertise. (R. at 25). But as Plaintiff notes in his brief, Dr. Freeman specifically opined that interruptions would arise from pain caused by Plaintiff's physical impairments, not as manifestations of any mental impairment. (*Id.* at 1064) (describing "frequent interruption of both mental and physical activities by pain [from] joint inflammation and spinal stenosis"). Therefore, it was appropriate for Dr. Freeman, who practices in internal medicine and neurology, to offer an opinion on this point. (*Id.* at 1065). Moreover, even if Dr. Freeman's statement could be bifurcated to mean that Plaintiff's pain somehow interrupts his

physical activities without interrupting his mental activities, the ALJ included *no* limitation due to interruptions in either her RFC assessment or her questioning of the VE, leaving no explanation for her omission of the physical portion of Dr. Freeman's opinion.

Second, the ALJ found that "no evidence" supports the lifting limitations assessed by Dr. Freeman. Plaintiff in response compares Dr. Freeman's finding that Plaintiff can lift up to twenty pounds "no more than 1% of the time" with Plaintiff's hearing testimony that he can lift twenty pounds "for three to five minutes," explaining that 1% of a work day equates to 4.8 minutes, which falls within the estimate provided by Plaintiff. (Dkt. 17 at 4). Such calculations are not necessary. As Dr. Freeman stated in his report, he relied in part on physical therapy notes in determining Plaintiff's capacities. (R. at 1061). Detailed notes from Plaintiff's physical therapy sessions document the fact that Plaintiff gradually increased his heaviest lifts to a maximum of just nine pounds, and for many exercises lifted just two or six pounds, over dozens of sessions in 2012 and 2013. (*Id.* at 1037–59). Additionally, Plaintiff's physical exams consistently revealed strength deficits and reports of pain on motion in the left shoulder. (*Id.* at 231, 727, 954). That Plaintiff lifts no more than nine pounds for a limited number of repetitions, even under the close supervision of a trained therapist, provides at least some support for Dr. Freeman's finding that Plaintiff can safely lift light items only rarely and other items only very rarely while at work.

Because the ALJ has not provided the requisite "sound explanation" for choosing the opinion of consultant Dr. Stevens over that of consultant Dr. Freeman, her resulting RFC assessment is not supported by substantial evidence and this case must be remanded to rectify the error.[4]

## C. The ALJ Should Re-evaluate Plaintiff's Subjective Symptoms in Light of SSR 16-3p.

Plaintiff next asserts that the ALJ's assessment of his credibility is based on factual and legal error. The regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ considers "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2;[5] *see also* 20 C.F.R. § 404.1529. Second, once an underlying impairment capable of producing Plaintiff's symptoms is established,

---

[4] Plaintiff is also troubled by the ALJ's treatment of the Physical Residual Functional Capacity assessment completed by Dr. Vincent, contending that it is "unclear" what conclusions the ALJ drew from that opinion. (Dkt. 14 at 12). The ALJ's brief treatment of the agency reviewer's opinion is sufficiently clear. She accorded "some weight" to his May 2012 findings, but imposed additional restrictions in Plaintiff's RFC "in light of additional evidence" that was submitted later. (R. at 25). Most of the diagnostic and treatment records reviewed by Dr. Vincent related to his apparently successful cervical spine surgery, and the later-submitted evidence relates to his left shoulder complaint. Given that, there is no contradiction in the ALJ's statement that those opinions had "some" weight in her analysis of Plaintiff's combined conditions.

[5] With the recent issuance of SSR 16-3p, the Social Security administration has updated its guidance on evaluating symptoms in disability claims, eliminating the term "credibility" from its sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character. SSR 16-3p, 2016 WL 1119029 at *1 (effective March 16, 2016). While the new policy statement does apply to matters on appeal, the Court is also bound by case law concerning the same regulatory process under the "credibility" analysis of the former SSR 96-7p. *See Hagberg v. Colvin*, No. 14 C 887, 2016 WL 1660493, at *6–8 (N.D. Ill. Apr. 27, 2016); *Pietruszynski v. Colvin*, No. 14 C 2148, 2016 WL 1535158, at *6 & n.6 (N.D. Ill. Apr. 14, 2016).

the ALJ evaluates "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities" SSR 16-3p, at *2. In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 16-3p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c)(2)). Instead, both SSR 16-3p and its predecessor SSR 96-7p require the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

The Court will uphold an ALJ's evaluation of symptoms if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 940. On remand, after a proper consideration of the opinion evidence as described above, the ALJ should take care to reevaluate Plaintiff's subjective complaints in accordance with SSR 16-3p.

**D. Time Off Task**

Plaintiff's final contention, that the ALJ failed to account for his time off task in formulating her RFC assessment, flows directly from his criticism of the ALJ's treatment of the opinion evidence, as described above. Therefore, the Court will not address Plaintiff's final argument directly at this time, but instead instructs the ALJ on remand to explain how she assessed Dr. Freeman's opinion on this point.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [13] is **GRANTED**. Defendant's Motion for Summary Judgment [15] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405, the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: June 28, 2016

*Mary M Rowland*

MARY M. ROWLAND
United States Magistrate Judge